[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-16486; 16-16783

_____

D.C. Docket No. 0:15-cv-60716-WPD


DR. DAVID S. MURANSKY,
individually and on behalf of all others similarly situated,

Plaintiff - Appellee,

JAMES H. PRICE,
ERIC ALAN ISAACSON,

Interested Parties - Appellants,

versus

GODIVA CHOCOLATIER, INC.,
a New Jersey corporation,

Defendant - Appellee.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(October 3, 2018)

Before MARTIN, JORDAN, and GINSBURG,[*] Circuit Judges.

MARTIN, Circuit Judge:

This appeal was brought to contest the approval of a class-action settlement. Dr. David Muransky filed a class action against Godiva Chocolatier, Inc. for violating the Fair and Accurate Credit Transactions Act ("FACTA"). Appellants James Price and Eric Isaacson ("the objectors") objected to a class settlement reached by Dr. Muransky and Godiva. Over their objections, the District Court approved the settlement, class counsel's request for attorney's fees, and an incentive award for Dr. Muransky. After careful review and with the benefit of oral argument, we affirm.

## I. Background

In April 2015, Dr. Muransky filed a class action against Godiva for allegedly violating FACTA. FACTA prohibits merchants from printing "more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of the sale or transaction." 15 U.S.C. § 1681c(g)(1). The operative complaint alleges that after Dr. Muransky made a purchase at a Godiva store, Godiva gave him a receipt that showed his credit card number's first six and last four digits. Dr. Muransky sought to represent a class of customers whose

_____

[*] Honorable Douglas H. Ginsburg, United States Circuit Judge for the District of Columbia Circuit, sitting by designation.

credit card numbers Godiva printed on receipts in violation of FACTA.  These violations, the complaint says, exposed Dr. Muransky and the class "to an elevated risk of identity theft."  According to the complaint, Godiva's violation of FACTA was willful, so the class was entitled to statutory and punitive damages, as well as attorney's fees and costs.  See id. § 1681n(a).

Godiva moved to dismiss the complaint on the ground that it did not plausibly allege a willful violation of FACTA.  The District Court denied Godiva's motion.  After that, the parties engaged in discovery then mediated the case.  In late November 2015, the parties notified the court of an agreement in principle to settle the case on a class-wide basis.  They requested a stay, which the court granted.

Two months after that request, Dr. Muransky moved for preliminary approval of the class-action settlement.  He explained that the parties agreed to a settlement fund of $6.3 million from which all fees, costs, and class members would be paid.  He estimated that class members who submitted a timely claim form would receive around $235 as their pro-rata share of the settlement fund.  None of the money would revert to Godiva.  Dr. Muransky indicated he intended to apply for an incentive award of up to $10,000 and that class counsel would move for an award of attorney's fees of up to one-third of the settlement fund, which would be $2.1 million.

3

In this motion, Dr. Muransky also argued that the amount class members would recover by submitting a claim compared favorably to their possible recovery had the case proceeded to trial. FACTA provides for a combination of actual and statutory damages. 15 U.S.C. § 1681n(a). For statutory damages, FACTA provides for an award of $100 to $1,000 for each violation. Id. § 1681n(a)(1)(A). Given the nature of the violation, Dr. Muransky acknowledged there was "a good chance" each class member would recover the $100 minimum statutory damage award if the case went to trial. At the fairness hearing, the District Court agreed with Dr. Muransky's assessment, saying it was reasonable for class counsel to have estimated that class members "could [receive] more than double what the class members could get if they went to trial and won the case."

Dr. Muransky's motion also addressed some of the risks that favored pre-trial settlement. Most notably, Dr. Muransky pointed to two cases then pending before the Supreme Court: Spokeo, Inc. v. Robins, 578 U.S. ___, 136 S. Ct. 1540 (2016), on Article III standing, and Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. ___, 136 S. Ct. 1036 (2016), on class certification under Federal Rule of Civil Procedure 23(b)(3). The outcomes of those two cases, which at the time were uncertain, posed serious risks to the class members' ability to pursue FACTA claims against Godiva. Dr. Muransky also acknowledged the difficulty of proving the "willfulness" of Godiva's FACTA violation, which the District Court also

4

discussed at the fairness hearing.  Without proving "willfulness," the class would not be entitled to statutory damages.  See 15 U.S.C. § 1681n(a).

The motion for preliminary approval also contained a proposed class notice and a proposed schedule of notice, opt-out, and motion deadlines.  The proposed notice said Dr. Muransky would seek an incentive award of up to $10,000 "for his work in representing the class" and that class counsel would seek up to $2.1 million in attorney's fees.  The District Court granted the motion for preliminary approval, certified the class under Rule 23(b)(3), and approved the form of notice. Under the preliminary approval order, class members who wanted to be excluded from the settlement were required to give written notice of exclusion to the claims administrator.  Those who failed to submit an opt-out certification would be included in the settlement class and bound by its terms.  Then to get money from the settlement fund, class members had to file a claim form with the claims administrator.  Class members could also file objections, which the court would consider as part of its determination of whether the settlement was fair.  After extensions by the District Court, the final deadline for class members to submit claims, object, or opt-out was August 23, and the deadline for Dr. Muransky to move for final settlement approval was September 9.

Notice of the settlement was sent to 318,000 class members and over 47,000 submitted claim forms.  Only fifteen class members opted out.  Five class

members, including Mr. Price and Mr. Isaacson, objected to the settlement. In their objections, Mr. Price and Mr. Isaacson said they are members of the settlement class and that they timely submitted claim forms. Among other arguments, they said notice of Dr. Muransky's attorney's fee motion was inadequate under Rule 23(h); the court should subject any attorney's fee award to a lodestar analysis; and a $10,000 incentive award was not warranted.

On September 7, Dr. Muransky moved for final approval of the class settlement and requested an award of $2.1 million in attorney's fees as well as $10,000 as an incentive award. At the court's direction, Dr. Muransky filed a separate motion for attorney's fees and expenses. The Magistrate Judge issued a report and recommendation ("R&R") on the attorney's fee motion just four days later, before the objectors filed opposition briefs. The R&R recommended that the District Court grant the motion and award the full amount of $2.1 million. Although the R&R was issued before the objectors filed opposition briefs, the Magistrate Judge considered Mr. Price's and Mr. Isaacson's previously filed objections to the settlement. In addition, soon after the R&R was issued, the objectors filed briefs in opposition to the motion for attorney's fees. They later filed objections to the R&R as well.

On September 21, the District Court held a fairness hearing, during which objectors' counsel made their case. During the hearing, Mr. Isaacson's counsel

6

raised standing as a new objection, saying that the court needed to decide whether Dr. Muransky had Article III standing.  Soon after the hearing, the District Court approved the settlement and awarded the incentive award and attorney's fees to Dr. Muransky and class counsel respectively.  In response to the objectors' argument that notice was not adequate, the District Court noted it had "permitted objections to be filed both before and after" the motion for attorney's fees was filed and that "meaningful objections were in fact filed both before and after the filing" of that motion.  The court said it had reviewed the class members' objections to the R&R de novo, "taken them into full consideration," and "carefully analyzed" them.  The court then found that the requested attorney's fees were reasonable and awarded $2.1 million, one-third of the settlement fund, in fees.  The Court also granted the $10,000 incentive award for Dr. Muransky's "efforts in this case."

The objectors appealed.  They say the District Court abused its discretion by finding that the notice satisfied Rule 23(h), by awarding $2.1 million in attorney's fees, and by awarding $10,000 as an incentive to Dr. Muransky.   Mr. Isaacson raises a fourth issue: he challenges Dr. Muransky's Article III standing to pursue a FACTA claim against Godiva.  Before addressing those arguments, we consider the objectors' ability to make them on appeal.  We then consider the merits of the arguments properly before us.

## II. Jurisdiction

### A. The objector's right to appeal

The Supreme Court has held "only parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment." Marino v. Ortiz, 484 U.S. 301, 304, 108 S. Ct. 586, 587 (1988) (per curiam). We start by deciding whether objectors like Mr. Price and Mr. Isaacson are "parties" with the ability to appeal from a district court's judgment. We hold that they are.

In Devlin v. Scardelletti, 536 U.S. 1, 122 S. Ct. 2005 (2002), the Supreme Court addressed whether a nonnamed class member who timely objects to a settlement agreement but does not opt out is a "party for the purposes of appealing the approval of the settlement." Id. at 7, 122 S. Ct. at 2009 (quotation marks omitted). The Court held that nonnamed class members who are bound by a judgment must "be allowed to appeal the approval of a settlement when they have objected at the fairness hearing." Id. at 10, 122 S. Ct. at 2011. "To hold otherwise," the Court explained, "would deprive nonnamed class members of the power to preserve their own interests in a settlement that will ultimately bind them, despite their expressed objections before the trial court." Id.

Devlin addressed a mandatory settlement class, but not whether objectors to a Rule 23(b)(3) settlement who can opt out of a settlement also are "parties" that can appeal. See id. at 10–11, 122 S. Ct. at 2011 (noting that appeal was the

8

objectors' only option because they could not opt out of the settlement). Since Devlin, the only circuit courts of appeal to have decided this issue have held that class members who object to a Rule 23(b)(3) settlement but do not opt out are "parties" for purposes of appeal.[1] Generally, these courts reason that Devlin "is about party status and one who could cease to be a party is still a party until opting out." Nat'l Ass'n of Chain Drug Stores, 582 F.3d at 40. In AAL High Yield Bond Fund v. Deloitte & Touche LLP, 361 F.3d 1305 (11th Cir. 2004), this Court ruled that objectors who were not class members could not appeal because they were not "parties who are actually bound by a judgment." Id. at 1310. Yet at the same time, we know that actual class members who object but do not opt out of a Rule 23(b)(3) class settlement are still bound by the judgment approving the class settlement. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614–15, 117 S. Ct. 2231, 2245 (1997). With all of this in mind, we conclude that class members who object to Rule 23(b)(3) class settlements but do not opt out are "parties" for purposes of appeal. Mr. Price and Mr. Isaacson are therefore proper parties.

## B. Article III standing

"We review our subject matter jurisdiction de novo." Day v. Persels & Assocs., LLC, 729 F.3d 1309, 1316 (11th Cir. 2013). Article III of the

---

[1] Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund, 582 F.3d 30, 39–40 (1st Cir. 2009); Fidel v. Farley, 534 F.3d 508, 512–13 (6th Cir. 2008); Churchill Vill., LLC v. Gen. Elec., 361 F.3d 566, 572–73 (9th Cir. 2004); In re Integra Realty Res., Inc., 354 F.3d 1246, 1257–58 (10th Cir. 2004).

9

Constitution limits our jurisdiction to "cases" or "controversies." Standing is one of the essential components of Article III's case or controversy requirement. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136 (1992). Standing, in turn, has "three elements: injury in fact, causation, and redressability." Nicklaw v. Citimortgage, Inc., 839 F.3d 998, 1001 (11th Cir. 2016). An injury in fact must be concrete, particularized, and actual or imminent. Lujan, 504 U.S. at 560, 112 S. Ct. at 2136. Mr. Isaacson argues that Dr. Muransky has not alleged a concrete injury in fact that confers Article III standing under the Supreme Court's decision in Spokeo, 136 S. Ct. at 1548. We have concluded to the contrary.

To determine whether a statutory violation results in a concrete injury, we consider both "history and the judgment of Congress." Id. at 1549. More specifically, we look to whether the intangible harm that results from the statutory violation bears a "close relationship" to harms that have "traditionally been regarded as providing a basis for a lawsuit in English or American courts." Id. And we consider the judgment of Congress because it "is well positioned to identify intangible harms that meet minimum Article III requirements." Id.

But before we get ahead of ourselves, we stop to examine the duties imposed and the rights conferred by FACTA. FACTA, which is an amendment to the Fair Credit Reporting Act, "is aimed at protecting consumers from identity theft." Harris v. Mexican Specialty Foods, Inc., 564 F.3d 1301, 1306 (11th Cir. 2009). To

10

do that, FACTA imposes a duty on merchants "that accept[] credit cards or debit cards for the transaction of business" not to "print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of the sale or transaction."  15 U.S.C. § 1681c(g)(1).  FACTA authorizes customers to bring private actions against merchants that willfully or negligently violate this duty.  15 U.S.C. §§ 1681n(a); 1681o(a).  A merchant willfully violates FACTA by acting in knowing violation of its statutory duties or by acting in reckless disregard of those duties.  See Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 57–58, 127 S. Ct. 2201, 2208–09 (2007).  For willful violations, customers may recover actual damages or statutory damages from $100 to $1000, and punitive damages.  15 U.S.C. § 1681n(a)(1), (a)(2); Safeco, 551 U.S. at 53, 127 S. Ct. at 2206.  Customers can recover statutory damages for willful violations even if they cannot show their identity was stolen or credit impacted, 15 U.S.C. § 1681n(a), and even if they received and kept the defective receipt.  Engel v. Scully & Scully, Inc., 279 F.R.D. 117, 125–26 (S.D.N.Y. 2011).  By contrast, when the violation is a result of negligence, customers can only recover their actual damages as well as attorney's fees.  15 U.S.C. § 1681o(a); Engel, 279 F.R.D. at 125–26.

Dr. Muransky alleged that Godiva willfully violated its duty not to print more than five digits of his credit card number on a receipt.  See 15 U.S.C.

11

§§ 1681c(g)(1), 1681n(a).  We must therefore examine whether a merchant's willful violation of FACTA's card-truncation duties and any resulting harms bears a "close relationship" to causes of action recognized at common law.  See Spokeo, 136 S. Ct. at 1549.  This court has made similar inquiries, analogizing to common law causes of actions in three cases decided since Spokeo.  In Perry v. Cable News Network, Inc., 854 F.3d 1336 (11th Cir. 2017), we held that the violation of the Video Privacy Protection Act conferred standing based in part on an analogy between the private right of action created by the Act and the common law tort of intrusion upon seclusion.  Id. at 1341.  Likewise, Pedro v. Equifax, Inc., 868 F.3d 1275 (11th Cir. 2017) analogized the violation of the Fair Credit Reporting Act based on reporting inaccurate credit information to the tort of defamation.  Id. at 1279–80.  Conversely, in Nicklaw, this Court rejected the plaintiff's attempt to analogize his statutory cause of action for the failure to timely record a (since recorded) satisfaction of mortgage to a common law quiet title action.  839 F.3d at 1002–03.

Here, Godiva's disclosure of Dr. Muransky's credit card number is similar to the common law tort of breach of confidence.  See Alicia Solow-Niederman, Beyond the Privacy Torts: Reinvigorating a Common Law Approach for Data Breaches, 127 Yale L.J. F. 614, 624–26 (2018) (arguing that data breaches

resemble the common law tort of breach of confidence).[2]  Typical breach of

confidence cases involve a customer entrusting formulas, letters, or images to a

trusted person, including merchants, who would without permission disclose these

items to other people, or to the public, or use them for personal gain.  See Richards

& Solove, 96 Geo. L.J. at 135–38 (collecting cases); cf. United States v. O'Hagan,

521 U.S. 642, 652–55, 117 S. Ct. 2199, 2207–08 (1997) (establishing the

misappropriation theory of insider trading based on similar principles).  An

important difference between the breach of confidence tort and privacy torts is the

identification of the harm.  In privacy suits, the harm is usually construed in terms

of exposure, "with an emphasis on publication as the cause of the harm."  Solow-

Niederman, 127 Yale L.J. F. at 621; see, e.g., Peterson v. Idaho First Nat. Bank,

367 P.2d 284, 286–88 (Idaho 1961) (rejecting a tort claim because disclosure of a

customer's bank records to his employer did not amount to public disclosure for

purposes of the right to privacy).  But in breach of confidence cases, the harm

happens when the plaintiff's trust in the breaching party is violated.  See

---

[2] The tort of breach of confidence was recognized at the time of the country's founding but has rarely been used because of the development of modern privacy torts.  Neil M. Richards & Daniel J. Solove, Privacy's Other Path: Recovering the Law of Confidentiality, 96 Geo. L.J. 123, 135–38, 156–58 (2007); see also Pavesich v. New England Life Ins. Co., 50 S.E. 68, 68–69, 75 (Ga. 1905) (describing how privacy torts in the United States and England before 1890 were "founded upon a supposed right of property, or a breach of trust or confidence, or the like"); Samuel D. Warren & Louis D. Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193, 207–08 (1890) (describing cases "where protection has been afforded against wrongful publication . . . upon the ground of an alleged breach of an implied contract or of a trust or confidence").

McCormick v. England, 494 S.E.2d 431, 437–38 (S.C. Ct. App. 1997) (distinguishing privacy torts from breach of confidence).  Under this view, when a customer uses a credit card to make purchases, he entrusts the merchant with his card number and his trust is violated when that card number is not kept confidential.

The willful violation of FACTA's card-truncation duty also resembles a modern version of a claim for breach of an implied bailment agreement.  The common law has often implied a bailment agreement when a merchant holds a customer's property as a necessary incident to the merchant's business.  Woodruff v. Painter, 24 A. 621, 622 (Pa. 1892) (holding a shop could be liable for a watch that went missing while a customer tried on a suit); Bunnell v. Stern, 25 N.E. 910 (N.Y. 1890) (holding a shop could be liable for a customer's missing cloak).  When a bailment relationship is implied, the merchant has a duty to protect the customer's property from damage, loss, or theft.  See, e.g., Armored Car Serv., Inc. v. First Nat. Bank of Miami, 114 So. 2d 431, 434 (Fla. 3d DCA 1959) (describing the rule that an implied bailment for the mutual benefit of both parties imposes a duty on the bailee to avoid ordinary negligence).  A bailee is also obligated to return the bailor's property in a time, place, and manner proscribed by agreement or "by the nature of the objective to be accomplished by the bailment."  See 8A Am. Jur. 2d Bailments § 134. Viewed through a bailment lens, Godiva is a bailee

14

of Dr. Muransky's credit card information and, if returned on a printed receipt, has a duty to return it without displaying "more than the last 5 digits of the card number." See 15 U.S.C. § 1681c(g); cf. Carpenter v. United States, 585 U.S. ___, 138 S. Ct. 2206, 2269 (2018) (Gorsuch, J., dissenting) (describing how "ancient principles" from bailment cases "may help us address modern data cases too"); Ian Samuel, Carpenter and the Property Vocabulary, Harv. L. Rev. Blog (Dec. 8 2017), https://blog.harvardlawreview.org/carpenter-and-the-property-vocabulary/.

These common law torts bear a "close relationship" to the statutory cause of action authorized by Congress. By passing FACTA, Congress expressed its judgment that prohibiting merchants from printing more than five digits of a customer's credit card number would "reduce identity theft and credit card fraud." Credit and Debit Receipt Clarification Act of 2007, Pub. L. 110-241, § 2(a)(6), 122 Stat. 1565, 1565. To achieve its goals, Congress established a duty of care for merchants that print receipts and defined that duty as requiring printing no more than five digits of customers' credit card numbers. See 15 U.S.C. § 1681c(g)(1). Congress also made willful violations of that duty actionable, even when the customer owed that duty had suffered no actual damages. Id. § 1681n(a)(1)(A). We can infer from these two provisions that Congress conceived of the harm as happening when the merchant provides a customer with an untruncated receipt. See In re Horizon Healthcare Servs. Inc. Data Breach Litig., 846 F.3d 625, 639 (3d

15

Cir. 2017) (Congress "allowed for statutory damages for willful violations—which clearly illustrates that Congress believed that the violation of FCRA causes a concrete harm to consumers."); see also Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A., 781 F.3d 1245, 1251 (11th Cir. 2015) (observing that Congress's creation of legal rights that satisfy Article III standing "may be inferred from conduct prohibited" by statute).  Thus, the structure and purpose of FACTA show that it provides customers the right to enforce the nondisclosure of their untruncated credit card numbers, similar to the rights and harms asserted in breach of confidence cases.[3]  The resulting harm from the statute's violation is "concrete in the sense that it involves a clear de facto injury, i.e., the unlawful disclosure of legally protected information."  See In re Nickelodeon Consumer Privacy Litig., 827 F.3d 262, 274 (3d Cir. 2016).  We therefore conclude printing more than five digits of a credit card number in willful violation of FACTA causes the person whose account number is disclosed to suffer a concrete injury.  See Perry, 854 F.3d at 1340.[4]

---

[3] Because the harm suffered when a merchant prints untruncated credit card information is like a breach of confidence or the breach of an implied bailment agreement, we reject the reasoning of courts that only compare FACTA claims to privacy torts.  See, e.g., Gesten v. Burger King Corp., No. 17-22541, 2017 WL 4326101, at *5 (S.D. Fla. Sept. 27, 2017).

[4] In this way, Dr. Muransky also satisfies Justice Thomas's injury-in-fact test.  Spokeo, 136 S. Ct. at 1550 (Thomas, J., concurring).  Justice Thomas's test focuses on the distinction between a plaintiff's enforcement of private rights versus public rights.  Id.  For "plaintiff[s] seeking to vindicate a statutorily created private right," Justice Thomas concluded they "need not allege actual harm beyond the invasion of that private right."  Id. at 1553.  Justice Thomas

16

We recognize there are some differences between these common law causes of action and the willful violation of FACTA's card-truncation duties. For instance, in the bailment context, there is usually tangible harm to property. Also, these common law torts usually are complete after the person entrusted with property or information gives it to a third party or uses it for their own personal gain. But the point is not that Dr. Muransky's harm would have been actionable at common law. The inquiry under Spokeo is whether the alleged harm bears a "close relationship" to one actionable at common law. See Spokeo, 136 S. Ct. at 1549. And even when the harm that results from violation of the statute differs somewhat from a harm recognized at common law, Congress "has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed [at common law] before." Spokeo, 136 S. Ct. at 1549 (quotation marks omitted). We conclude any differences between the common law torts discussed above and the FACTA cause of action are an example

supported the Court's decision to remand in Spokeo for the lower courts to consider whether "Congress ha[d] created a private duty owed personally to [the plaintiff] to protect his information," in which case, "the violation of the legal duty suffices for Article III injury in fact." Id. at 1554.

Here, FACTA imposes on merchants a duty to protect customers' credit card information, and customers have a private right to enforce FACTA duties that merchants owe personally to them. See 15 U.S.C. §§ 1681c(g)(1), 1681n(a); see also Palm Beach,781 F.3d at 1252 (recognizing that the Telephone Consumer Protection Act created a "cognizable right" that recipients of junk faxes can enforce). This satisfies the test articulated by Justice Thomas in Spokeo, 136 S. Ct. at 1553–54.

17

of Congress's use of this power.

When the violation of a statute creates a concrete injury, as it does here, plaintiffs do not need to allege "additional harm beyond the one Congress has identified." Spokeo, 136 S. Ct. at 1549. But in this case, Dr. Muransky also pled that he received the receipt from Godiva and all indications are that he still has it. This has imposed an additional burden on him. When merchants breach their truncation duty, customers like Dr. Muransky must use their time (and wallet space) to safely dispose of or keep the untruncated receipt so as to avoid someone finding their credit card number on their receipt. This Court has held that this type of time wasting constitutes an injury in fact. See Palm Beach Golf, 781 F.3d at 1251–52 (holding that plaintiff suffered an injury in fact when unsolicited faxes electronically occupied plaintiff's telephone line and fax machine for one minute); Common Cause/Georgia v. Billups, 554 F.3d 1340, 1351 (11th Cir. 2009) (holding that the time it took to get an acceptable photo ID was sufficient to confer standing); id. at 1351–52 (holding that requiring someone to show a photo ID to vote is a sufficient injury); Fla. State Conference of NAACP v. Browning, 522 F.3d 1153, 1165 (11th Cir. 2008) (holding that the diversion of time and resources to counteract an unlawful action can satisfy the injury-in-fact requirement). Thus, in the context of FACTA, Dr. Muransky suffered a concrete injury when Godiva provided him with a receipt containing his untruncated credit card number, and he

18

had to "shoulder the cost" of protecting it.  See Florence Endocrine Clinic, PLLC v. Arriva Med., LLC, 858 F.3d 1362, 1366 (11th Cir. 2017).  Time spent safely disposing of or keeping the untruncated receipt is, of course, a small injury, but it is enough for standing purposes.  See Common Cause, 554 F.3d at 1351 ("The Supreme Court has rejected the argument that an injury must be significant; a small injury, an identifiable trifle, is sufficient to confer standing." (quotation marks omitted)).  Thus, when Godiva unlawfully gave an untruncated receipt to Dr. Muransky, he suffered the concrete injury of shouldering the cost of safely keeping or destroying the receipt.

Our holding that Dr. Muransky alleged a concrete injury is in keeping with the decisions of the Second, Seventh, and Ninth Circuits.  See Bassett v. ABM Parking Servs., Inc., 883 F.3d 776 (9th Cir. 2018); Crupar-Weinmann v. Paris Baguette Am., Inc., 861 F.3d 76 (2d Cir. 2017); Meyers v. Nicolet Rest. of De Pere, LLC, 843 F.3d 724 (7th Cir. 2016).  In those cases, customers alleged they suffered a risk of identity theft because merchants printed receipts that included the customers' credit card expiration date, a violation of FACTA, 15 U.S.C. § 1681c(g).  See Bassett, 883 F.3d at 777; Crupar-Weinmann, 861 F.3d at 78; Meyers, 843 F.3d at 725.  But well before those decisions, Congress had passed the Credit and Debit Card Receipt Clarification Act of 2007, Pub. L. No. 110-241, 122 Stat. 1565 (2008).  The Clarification Act's findings say that "[e]xperts in the field

19

agree that proper truncation of the card number, . . . <u>regardless of the inclusion of the expiration date</u>, prevents a potential fraudster from perpetrating identity theft or credit card fraud." <u>Id.</u> (emphasis added). For this reason, the Clarification Act gave amnesty from liability to merchants who printed an expiration date on a customer's receipt but otherwise complied with FACTA before passage of the Act. <u>Id.</u> § 3(a), 15 U.S.C. § 1681n(d). The decisions of our sister circuits all rely on the Clarification Act to hold that Congress does not consider an untruncated expiration date alone to be harmful. <u>See</u> <u>Bassett</u>, 883 F.3d at 781 ("Far from 'elevating' expiration date violations, the Clarification Act suggests that alleged injuries like Bassett's are not concrete."); <u>Crupar-Weinmann</u>, 861 F.3d at 78 ("Guided by unambiguous statutory language that a receipt with a credit card expiration date does not raise a material risk of identity theft, . . . we conclude that allegations in her amended complaint do not satisfy the injury-in-fact requirement . . . ."); <u>Meyers</u>, 843 F.3d at 727 ("Congress has specifically declared that failure to truncate a card's expiration date, without more, does not heighten the risk of identity theft.").

Here, Godiva printed the first six and last four digits of Dr. Muransky's credit card number without its expiration date. In contrast to the findings about expiration dates, the Clarification Act's findings also say that "proper truncation of the card number . . . prevents a potential fraudster from perpetuating identity theft

or credit card fraud." Clarification Act § 2(a)(6). Based on the Clarification Act's findings and the cause of action authorized by FACTA, Congress created actionable rights in customers against merchants that provide customers with receipts containing untruncated credit card numbers.

This case is also distinguishable from the Second Circuit's decision in Katz v. Donna Karan Co., 872 F.3d 114, 116 (2d Cir. 2017) for two reasons. First, Katz did not consider whether the FACTA violation was comparable to a breach of confidence tort or the breach of an implied bailment agreement. Second, Katz addressed a factual challenge to standing, and gave deference to district court fact-findings. Here, we address a facial challenge.

In Katz, the Second Circuit found no clear error in a district court's dismissal of a FACTA suit for lack of standing. Id. at 116. In the district court, the defendant presented evidence that the first six digits of a credit card number identify only the card's issuer and reveal nothing about the consumer. Id. at 118–19. By contrast, the Katz plaintiff asserted that the "more digits revealed, the more vulnerable a card number may be to a brute force cryptological attack." Id. at 120 (quotation marks omitted). In spite of the plaintiff's argument, the district court found no risk of harm to the consumer because the publication of the first six digits of a credit card number did not create a material risk of injury. Id. at 116. Based on this finding of fact, the Second Circuit affirmed, "conclud[ing] that the district

court did not clearly err in finding that the bare procedural violation in question did not raise a material risk of harm of identity theft." Katz , 872 F.3d at 121.  But the Second Circuit emphasized that it was not "resolv[ing] whether other procedural violations of FACTA should or will meet a similar outcome, a question for lower courts to determine in the first instance, on a case- and fact- specific basis." Id. Despite this admonition to consider future FACTA standing based on the case and facts of each distinct case,  many district courts have incorporated  the fact findings from Katz  into its legal analysis that FACTA violations do not create a concrete injury.  In this way,, these courts have transformed the fact-findings of a single district court into a bright-line, no-standing rule.  See, e.g., Tarr v. Burger King Corp., No. 17-23776, 2018 WL 318477, at *3 (S.D. Fla. Jan. 5, 2018) (collecting cases).[5]

There are a number of problems with relying on facts found in another FACTA case to say Dr. Muransky does not have standing here.  For one, the Katz

---

[5] Some of these same courts also say Congress could not have thought disclosure of the first six digits (the digits that identify the card-issuing bank) posed a risk because Congress did not also prohibit printing the name of the bank on the receipt.  See, e.g., Noble v. Nevada Checker Cab Corp., 726 F. App'x 582, 584 (9th Cir. 2018) (unpublished memorandum disposition).

No court has considered whether the congressional record reflects that  a rash of merchants were printing the name of the card-issuing bank on customer's receipts before the passage of FACTA.  Congress's decision to regulate printing more than the last five digits of a credit card number may well have been rationally related to the problem that was "acute to the legislative mind."  Williamson v. Lee Optical of Oklahoma Inc., 348 U.S. 483, 489, 75 S. Ct. 461, 465 (1955).  Just because Congress did not also prohibit printing the issuing bank's name does not mean we can infer Congress did not consider printing the first six digits to be risky.

plaintiff may have done a poor job at proving standing as a factual matter and therefore findings against him should not preclude standing for others.  See Katz, 872 F.3d 121 ("The plaintiff did not seek the opportunity to supplement the record with additional evidence after defendants included in their motion papers extrinsic evidence suggesting that printing the [issuer identification number] did not increase the risk of harm."); see also id. at 121 (noting that "in some circumstances, a fact-finding hearing with expert witness testimony may very well be appropriate [to decide standing], depending on the novelty of the issue, the extent of the material dispute of facts, and the statutory prohibition in question."). Adverse findings in a single case generally do not bind people who were not parties or privies to parties  to it.  See Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found., 402 U.S. 313, 329, 91 S. Ct. 1434, 1443 (1971).  This rule applies "with equal force to questions of jurisdiction," including standing.  See Underwriters Nat'l Assur. Co. v. N.C. Life & Acc. & Health Ins. Guar. Ass'n, 455 U.S. 691, 706–07 & n.13, 102 S. Ct. 1357, 1367 & n.13 (1982).

Another problem with developing bright-line FACTA-standing rules based on facts found in other cases relates to variations in the amount of risk related to different disclosures or data breaches in light of evolving technology.  The idea that the first six digits do not pose a risk of identity theft appears to have its origin in expert reports and declarations by Mari Frank in 2007 and 2008.  See Bateman

v. Am. Multi-Cinema, Inc., 252 F.R.D. 647, 651 (C.D. Cal. 2008), rev'd and remanded, 623 F.3d 708 (9th Cir. 2010); Lopez v. KB Toys Retail, Inc., 2:07–cv– 00144, Dkt. No. 28 at 5 (C.D. Cal. July 17, 2007).  In these cases, Frank opined that disclosing the first four to six digits of a credit card number do not pose a risk because "the mathematical probability" of guessing "the remainder of the digits necessary to complete a transaction is miniscule, either 10,000,000:1 or 1000,000,000:1."  Bateman, 252 F.R.D. at 651.  The same expert opinion was adopted by another  district court in 2010.  See In re Toys "R" Us - Delaware, Inc. - Fair & Accurate Credit Transactions Act (FACTA) Litig., No. CV 06-08163 MMM FMOX, 2010 WL 5071073, at *12 (C.D. Cal. Aug. 17, 2010).

The Toys "R" Us decision is often cited for the proposition that printing the first six digits poses no risk of harm.  See, e.g., Coleman v. Exxon Mobil Corp., No. 1:17-CV-119-SNLJ, 2018 WL 1785477, at *4 (E.D. Mo. Apr. 13, 2018) (citing Toys "R" Us, 2010 WL 5071073, at *12, and collecting other cases also citing Toys "R" Us).  Yet it is not apparent that any of these district courts considered whether it still made sense to rely on facts established in these older cases, in light of technological changes related to brute-force cryptological attack on credit card numbers .  See Katz, 872 F.3d at 118 (summarizing plaintiff's contention that disclosure of the first six numbers, in addition to the last four, makes plaintiff more vulnerable to "computer-assisted guessing" of his remaining

24

card numbers). Neither are we aware of a court that has taken a fresh look at the argument that an identity thief could use the first six digits, in combination with other available information, to access more information about a victim than would have been possible in 2007. See Toys "R" Us, 2010 WL 5071073, at *12–13 (summarizing plaintiff's expert's opinion that disclosure of the first six digits makes it easier for thieves to acquire other identifying information).

These problems show the importance of the Second Circuit's admonition that standing in FACTA cases is "a case- and fact- specific" question. See id. at 121. We echo that sentiment and know that district courts will consider standing in light of existing precedent as applied to the "case or controversy" and accompanying record actually before them. See GTE Directories Pub. Corp. v. Trimen Am., Inc., 67 F.3d 1563, 1567 (11th Cir. 1995) ("The determination of whether an actual case or controversy exists is determined on a case-by-case basis.").

Here, we are presented with a facial challenge to Dr. Muransky's standing, so we must take the allegations in the complaint as true and evaluate whether those allegations plausibly allege standing. See Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc., 524 F.3d 1229, 1232 (11th Cir. 2008) (per curiam) (distinguishing between facial and factual attacks on standing). As set out above, the complaint alleges two concrete injuries: one based on the statutory violation

and its relationship to common law causes of action and another based on Godiva giving Dr. Muransky an untruncated receipt. Mr. Isaacson has not challenged any other aspect of Dr. Muransky's standing, and we conclude the other Article III standing requirements are satisfied.

## III. The Merits

### A. Notice of class counsel's attorney's fee motion

We now consider the objectors' challenge to the sufficiency of notice of the attorney's fee motion. As required by Rule 23(c)(2)(B), these class members got notice of the preliminary approval of the class settlement. That notice gave information about the attorney's fees and expenses Dr. Muransky would seek:

> Plaintiff will petition for a service award not to exceed $10,000 for his work in representing the Class, and for Class Counsel's fees not to exceed one-third of the fund, which is $2,100,000, plus reasonable expenses.

Class members got this notice in advance of counsel's motion for attorney's fees. Yet the attorney's fees motion was not filed until two weeks after the deadline for class members to object had already passed.[6] The class did not receive additional notice after the motion was filed. The objectors say this process deprived class members of the notice they needed to assess the fee request and violated Rule 23(h).

---

[6] Dr. Muransky originally made the attorney's fee request on September 7 as part of the motion for final approval. The District Court instructed him to file a separate attorney's fee motion, which he did on September 12.

Rule 23(h) sets up the procedures required for an award of attorney's fees in class actions.  As for notice, Rule 23(h)(1) says that "[n]otice of the motion [for attorney's fees] must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner."  Fed. R. Civ. P. 23(h)(1).  Although "reasonable manner" is not specific about when notice must be given, courts interpreting Rule 23(h) have observed that the right to object to the fee motion under Rule 23(h)(2) necessarily means that courts must give notice  of the attorney's fee motion itself.  The leading case is In re Mercury Interactive Corp. Securities Litig., 618 F.3d 988, 989 (9th Cir. 2010).  The Ninth Circuit interpreted "[t]he plain text of" Rule 23(h) to "require[] that any class member be allowed an opportunity to object to the fee 'motion' itself, not merely to the preliminary notice that such a motion will be filed."  Id. at 993–94 (quoting Fed. R. Civ. P. 23(h)(2)).  The Advisory Committee's notes support the Ninth Circuit's interpretation of Rule 23(h).  They say that "[i]n setting the date objections are due, the court should provide sufficient time after the full fee motion is on file to enable potential objectors to examine the motion."  Fed. R. Civ. P. 23 advisory committee's note to 2003 amendment.  The Seventh Circuit follows the Ninth Circuit's Mercury decision.  Redman v. RadioShack Corp., 768 F.3d 622, 637–38 (7th Cir. 2014); see also 3 Newberg on Class Actions § 8:24 (5th ed.) (endorsing the approach of the Ninth and Seventh Circuits on doctrinal and policy grounds).

27

The Ninth Circuit's holding in <u>Mercury</u> was that "class members were deprived of an adequate opportunity to object to the motion itself because, by the time they were served with the motion, the time within which they were required to file their objections had already expired."  618 F.3d at 994.  That same sequence—objection deadline before a filed motion for attorney's fees—was what happened here.  As in <u>Mercury</u>, this schedule deprived class members of "an opportunity to object to the fee motion itself" because they had to file objections before the motion was even filed.  <u>See</u> <u>id.</u> at 993–94.  As a result, this process violated Rule 23(h).[7]

Although we conclude the District Court erred by requiring class members to object before they could assess the attorney's fee motion, we hold that error does not warrant reversal under the particular facts of this case.  After receiving the notice, four class members objected.  Two of those, Mr. Price and Mr. Isaacson, made detailed arguments in opposition to the requested attorney's fee and incentive awards, including by filing opposition briefs after Dr. Muransky filed the

---

[7] The objectors also argue that the class notice did not provide class members with sufficient information to file meaningful objections to class counsel's attorney's fee request.  Mr. Price, for example, says the notice should have advised class members of the "Eleventh Circuit's 25% benchmark for attorneys' fees [or] of Class Counsel's justification for seeking a $525,000 bonus" above the 25% benchmark.  Rule 23(h) requires only that notice of an attorney's fee motion be "served on all parties and . . . directed to class members in a reasonable manner."  Fed. R. Civ. P. 23(h).  The objectors cite no authority that requires the detail they request.  Decisions about the detail in descriptions about the attorney's fees required to be included in class notice are necessarily case specific and are best left to the discretion of district courts.

attorney's fee motion.  Cf. Coleman v. Smith, 828 F.2d 714, 716–17 (11th Cir. 1987) (per curiam) (holding that notice of consequences of summary judgment was adequate in part because party's actions showed he understood how to respond to summary judgment motion).  The arguments made against the attorney's fee motion were considered by the Magistrate Judge and by the District Court.  And on this record, we have no reason to think other unnamed class members would have made arguments besides those made by Mr. Price and Mr. Isaacson.  Class members were not therefore prejudiced by the objection schedule established by the District Court.  See Voeller v. Neilston Warehouse Co., 311 U.S. 531, 537, 61 S. Ct. 376, 379 (1941) (observing that "the rights of parties are habitually protected in court by those who act in a representative capacity"); see also O'Bannon v. Town Court Nursing Ctr., 447 U.S. 773, 797, 100 S. Ct. 2467, 2482 (1980) (Blackmun, J., concurring) (because nursing home had an interest in making the same arguments as absent patients, those patients' due process interests were satisfied).  The District Court did not abuse its discretion by awarding attorney's fee, despite the Rule 23(h) violation.

## B.  The attorney's fee award

The objectors also argue that the District Court made a mistake by awarding 33% of the class settlement fund as attorney's fees to Dr. Muransky's counsel. The District Court's approval of the attorney's fee award is reviewed for abuse of

discretion.  Camden I Condo. Assoc. v. Dunkle, 946 F.2d 768, 770 (11th Cir. 1991).  "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous."  Aycock v. R.J. Reynolds Tobacco Co., 769 F.3d 1063, 1068 (11th Cir. 2014) (quotation marks omitted).  Under this standard, district courts have "great latitude" in setting fee awards in class action cases.  See Faught v. American Home Shield Corp., 668 F.3d 1233, 1242 (11th Cir. 2011) (citation and internal quotation marks omitted).  We conclude the District Court did not abuse its discretion.

To begin, the objectors say the District Court applied the wrong legal test to evaluate Dr. Muransky's attorney's fee request.  In their view, the District Court should have applied a lodestar analysis that multiplied the number of hours counsel worked by the prevailing hourly rate.  They claim that analysis is required by Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 546, 130 S. Ct. 1662, 1669 (2010).  In Perdue, the Supreme Court decided "whether the calculation of an attorney's fee, under federal fee-shifting statutes, based on the 'lodestar,' i.e., the number of hours worked multiplied by the prevailing hourly rates, may be increased due to superior performance and results."  Id.  The Court allowed the award of attorney's fees under a fee-shifting statute to be enhanced above the lodestar amount, but only in "rare" and "exceptional" cases.  Id. at 554, 130 S. Ct. at 1674.  Here, the

30

objectors say the District Court should have followed Perdue because class counsel's fees would have been decided under a fee-shifting statute if the class prevailed against Godiva. See 15 U.S.C. § 1681n(a)(3) (providing for attorney's fees "in the case of any successful action to enforce any liability" for a willful violation of FACTA).

The problem for the objectors is that class counsel sought attorney's fees from a common fund rather than under a fee-shifting statute. See Fed. R. Civ. P. 23(h) (authorizing courts to award attorney's fees that are "authorized by law or by the parties' agreement"). Camden I holds that "attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." 946 F.2d at 774. The common-fund doctrine applies to class settlements that result in a common fund even when class counsel could have pursued attorney's fees under a fee-shifting statute. See Staton v. Boeing Co., 327 F.3d 938, 968–69 (9th Cir. 2003); Florin v. Nationsbank of Ga., 34 F.3d 560, 563 (7th Cir. 1994). Perdue addresses fee-shifting statutes and says nothing about the award of attorney's fees from a common fund. 559 U.S. at 554, 130 S. Ct. at 1674. Perdue is therefore not contrary to our precedent in Camden I.

In the alternative, the objectors say that the District Court misapplied Camden I by awarding 33% of the fund to class counsel. In Camden I, this Circuit called 25% of a common fund a benchmark attorney's fee award that "may be

31

adjusted in accordance with the individual circumstances of each case." 946 F.2d at 775. To evaluate whether the benchmark should be enhanced, district courts can apply the twelve factors from Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717–19 (5th Cir. 1974),[8] in addition to other class-settlement specific factors. Camden I, 946 F.2d at 775. We have also said that the "majority of common fund fee awards fall between 20% and 30% of the fund." Waters v. Int'l Precious Metals Corp., 190 F.3d 1291, 1294 (11th Cir. 1999). In this case, the objectors argue the District Court misapplied the Johnson factors in awarding 33% of the settlement fund as attorney's fees.

We see no abuse of discretion in the District Court's decision. Although the objectors "are correct that the fee award is bigger than some awards in other suits[,] . . . that does not mean the award is too big." Birchmeier v. Caribbean Cruise Line, Inc., 896 F.3d 792, 796 (7th Cir. 2018). The Magistrate Judge's R&R concluded that the Johnson factors supported the request for a fee above the 25% benchmark. That conclusion was based on weighing nine Johnson factors in favor of the enhanced award, including, by way of example, "the novelty and difficulty of the issues" and "the results obtained." After considering the objections to the

---

[8] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. Id. at 1209. We recognize that the Supreme Court criticized the Johnson factors in Perdue, 559 U.S. at 550–51, 130 S. Ct. at 1671–72. But as we've explained, Perdue arose in a different context (fee-shifting statutes), and we are bound to apply our precedent in Camden I and Johnson to this common fund.

R&R de novo, the District Court reached the same conclusion that "the requested attorneys' fees are reasonable under the Johnson/Camden I analysis."[9]  The District Court found that the settlement "confers substantial benefits" on class members. The District Court's order also emphasized "the results obtained," saying the class members who submitted claims "will receive cash payments that represent a significant portion of the damages that would be available to them were they to prevail in an individual action."  The District Court elaborated on these points at the fairness hearing.  There, the court discussed the significant legal hurdles class counsel faced, including the possibility that the Supreme Court would hold in Spokeo that risk of identity theft could not support standing.  The court explained the difficulty of proving willfulness, and its own skepticism that the evidence would support a willfulness finding in this case.

The District Court properly assessed the risks faced by the class and the compensation secured by class counsel.  Under the circumstances, the District Court did not abuse its discretion by awarding an above-benchmark percentage of the common fund.  The attorney's fee award is therefore affirmed.

## C. The incentive award

Finally, the objectors challenge the $10,000 incentive award the District Court approved for Dr. Muransky as class representative.  A district court's

---

[9] The District Court gave no weight to the Magistrate Judge's characterization of Mr. Price and Mr. Isaacson as "professional objectors."  We don't either.

decision to grant an incentive award to a named class representative is reviewed for abuse of discretion.  Hadix v. Johnson, 322 F.3d 895, 897 (6th Cir. 2003).

The objectors make two arguments on appeal.  First, Mr. Isaacson argues incentive awards are prohibited in common-fund settlements.  **[**Second, the objectors jointly challenge the $10,000 award as too large because they say Dr. Muransky put little personal time and effort into the litigation.  We reject both arguments.

Relying on two common fund cases, Mr. Isaacson says litigants who secure a common fund can recover reasonable attorney's fees and litigation expenses but cannot recover incentive awards for their own services.  See Central R.R. & Banking Co. v. Pettus, 113 U.S. 116, 122, 5 S. Ct. 389, 390 (1885); Trustees v. Greenough, 105 U.S. 527, 538 (1882).

We are not persuaded by this argument.  Many circuits have endorsed incentive awards and recognize them as serving the purposes of Rule 23.  See, e.g., Staton, 327 F.3d at 975–77; Hadix, 322 F.3d at 897–98.  No circuit has applied Greenough or Central Bank, which were decided well before the adoption of Rule 23, to prohibit incentive awards in the class-action context.  We do not view granting a monetary award as an incentive to a named class representatives as categorically improper.

At the same time, there are limits to an appropriate incentive award. In Holmes v. Continental Can Co., 706 F.2d 1144 (11th Cir. 1983), the class settlement awarded the class representatives different amounts than the unnamed class members because class counsel estimated that the named representatives had meritorious claims. Id. at 1148–49. This Court held that "[w]hen a settlement explicitly provides for preferential treatment for the named plaintiffs in a class action, a substantial burden falls upon the proponents of the settlement to demonstrate and document its fairness." Id. at 1147. We said that "a disparate distribution favoring the named plaintiffs requires careful judicial scrutiny into whether the settlement allocation is fair to the absent members of the class." Id. At the same time, we recognized that "the inference of unfairness" associated with unequal distributions "may be rebutted by a factual showing that the higher allocations to certain parties are rationally based on legitimate considerations." Id.

Like the settlement distribution in Holmes, incentive awards "provide[] for preferential treatment for the named plaintiffs," see id. at 1147, and create a similar possibility of collusion between class representatives, their counsel, and defendants. See id. at 1148; Hadix, 322 F.3d at 897 ("[I]ncentive awards are scrutinized carefully by courts who sensibly fear that [they] may lead named plaintiffs to expect a bounty for bringing suit or to compromise the interest of the class for personal gain."). As a result, we hold that incentive awards must be

35

supported by "legitimate considerations" sufficient to "dispel the cloud of collusion which such a settlement suggests."  See Holmes, 706 F.2d at 1147 (quotation marks omitted).

The parties dispute what those considerations should be.  The objectors focus on the time and money actually spent on the case by the named representative while Dr. Muransky argues that the value of the settlement to the class members is most important.  We see no reason to limit the discretion of district courts to consider the justifications proposed by either party.  Indeed, we are aware of a number of justifications regularly cited in support of incentive awards.  For example, incentive awards may be given "to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, . . . to recognize their willingness to act as a private attorney general," Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 958–59 (9th Cir. 2009), and to "induce an individual to become a named plaintiff," Montgomery v. Aetna Plywood, Inc., 231 F.3d 399, 410 (7th Cir. 2000).  Although these considerations will certainly weigh differently in different cases, together they "help illuminate the fact that class representatives . . . have typically done something the absent class members have not—stepped forward and worked on behalf of the class."  5 Newberg on Class Actions § 17.3.  All of these

justifications are legitimate, and district courts may exercise their discretion to determine whether they favor an incentive award in any given case.

Here, the District Court awarded Dr. Muransky $10,000 "for his efforts in this case." It is not clear what the District Court meant by that. Even so, we find that the record supports the incentive award. See Friends of the Everglades v. S. Fla. Water Mgmt. Dist., 678 F.3d 1199, 1201 (11th Cir. 2012) (explaining that a district court abuses its discretion when "neither the . . . decision nor the record provide sufficient explanation to enable meaningful appellate review" (emphasis added)); Cox Enters. v. News-Journal Corp., 510 F.3d 1350, 1361 (11th Cir. 2007) (finding no abuse of discretion in district court's decision not to award prejudgment interest based on the record). At the District Court, Dr. Muransky argued that an incentive award was justified by the size of the settlement. As previously discussed, the District Court found that the class settlement "confers substantial benefits" on the class members. And at the fairness hearing, the District Court observed that Dr. Muransky "was subjecting himself to inconvenience and time delays that didn't materialize as much as they might have, but they still were a possibility when he signed on as the class representative." These statements give meaning to the court's $10,000 incentive award to Dr.

37

Muransky "for his efforts in this case." [10]  We therefore hold that the District Court

did not abuse its discretion by granting this incentive award.

**AFFIRMED**.

---

[10] By our calculation, Dr. Muransky's incentive award had little impact on the class members' recovery.  Assuming 48,000 class members submitted valid claims (a high-end approximation) for the $4.2 million in the fund for distribution, Dr. Muransky's incentive award of $10,000 resulted in a reduction of about 21 cents in the recovery of the class members who filed claims ($87.50 vs. $87.29).

JORDAN, Circuit Judge, concurring:

I join Judge Martin's thorough opinion for the court. I write separately to note that Mr. Isaacson, a class member and one of the appellants, may lack Article III standing to challenge the Article III standing of Dr. Muransky, the named plaintiff and class representative.

As a member of the class, Mr. Isaacson did not just file objections to the proposed settlement; he chose not to opt out and submitted a claim for compensation pursuant to the settlement agreement. Given that the proposed settlement fund totaled $4.1 million after attorney's fees, and that approximately 47,000 class members filed claims, Mr. Isaacson stands to receive about $85 even if his arguments about the attorney's fees and the incentive award fail. Although that sum is not a king's ransom, there is no doubt that Mr. Isaacson is going to realize some financial benefit from the settlement.

Article III's standing requirements—injury-in-fact, causation, and redressability—persist "throughout the life of [a] lawsuit." *Wittman v. Personhuballah*, 136 S. Ct. 1732, 1736 (2016). As a result, standing "must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance." *Hollingworth v. Perry*, 570 U.S. 693, 705 (2013) (citation and quotation marks omitted). Because "standing is not dispensed in gross," it seems to me that Mr. Isaacson "must demonstrate standing for each claim he seeks

39

to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation and internal quotation marks omitted). If Mr. Isaacson "lacks standing to bring [a certain claim on] appeal, we lack jurisdiction over [that claim] and must dismiss it." *Tenille v. Western Union Co.*, 809 F.3d 555, 559 (10th Cir. 2015).

Mr. Isaacson certainly has standing on appeal to pursue his challenges to the deadline set by the district court for objections to the proposed settlement, to the attorney's fees awarded to counsel for the plaintiffs, and to the incentive award given to Dr. Muransky. An incorrect deadline could have certainly affected Mr. Isaacson's ability to assert objections to the motion for attorney's fees, and any decrease in the attorney's fees or the incentive award would be redistributed among the class members, potentially increasing Mr. Isaacson's own monetary recovery. But Mr. Isaacson has also challenged Dr. Muransky's standing to bring a FACTA claim in the first place, and it is with respect to that challenge that his standing is at best doubtful.

According to Mr. Isaacson—who happens to be a plaintiffs' class-action attorney—Dr. Muransky did not suffer an injury that allows him to bring a claim under FACTA because he "fail[ed] to allege that his credit suffered when he was handed a receipt with a few extra digits, or that anyone else knew of the violation or was in a position to take advantage of it to his injury." Br. for Mr. Isaacson at

40

34.  In a recent law review article that he authored, Mr. Isaacson explained his motivation for challenging Dr. Muransky's standing in the following way: "I was troubled by the notion that a class representative who suffered no injury should be able to evade the burden of demonstrating his own Article III standing . . . when entering [into] a class-action settlement that purports to release other class members' claims for actual damages."  Eric Alan Isaacson, *A Real-World Perspective on Withdrawal of Objections to Class Action-Settlements and Attorneys' Fees Awards: Reflections on the Proposed Revisions to Federal Rule of Civil Procedure 23(E)(5)*, 10 Elon L. Rev. 35, 51 (2018) (footnotes omitted).

I do not doubt the sincerity of Mr. Isaacson's convictions, but it might fairly be said that one could be just as troubled by the notion that an appellant who suffered no injury from a judgment should be able to seek reversal without demonstrating that he has been injured by that judgment and has Article III standing. After all, the desire to ensure compliance with the law affects only the "generalized interest of all citizens in constitutional governance."  *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 217 (1974).  *See also Hollingsworth*, 570 U.S. at 704 ("The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art[icle] III's requirements.").

41

Mr. Isaacson, as noted, stands to gain financially from the settlement. How, then, can it be said that Mr. Isaacson suffered any cognizable harm (aside from his arguments as to the deadline for objections, the attorney's fees, and the incentive award) from the institution of the lawsuit by Dr. Muransky and/or the consummation and approval of the settlement which provided him with a tangible benefit? If Mr. Isaacson thought that the action brought by Dr. Muransky on behalf of a class did not constitute a justiciable case or controversy under Article III, why did he not simply opt out and let the statute of limitations expire on any FACTA claim he might have had individually? Conversely, if Mr. Isaacson thought that he (unlike Dr. Muransky) had Article III standing to assert a FACTA claim and believed that he could do better as an individual litigant, why did Mr. Isaacson not simply file suit on his own against Godiva?

Stated differently, if Mr. Isaacson prevailed on his standing argument, I do not see how we could redress any injury he has suffered. *See Wittman*, 136 S. Ct. at 1732 (dismissing appeal by intervenors who could not explain how their alleged injury would be redressed by a favorable judicial decision). Indeed, Mr. Isaacson will cause himself injury if he succeeds because his monetary recovery—along with that of every class member—will be wiped out. For if Dr. Muransky has not suffered an Article III injury, he does not have standing to sue Godiva under FACTA, and that means that the entire case must be dismissed for want of a

42

justiciable case or controversy. *See generally* William B. Rubenstein, 1 Newberg on Class Actions § 2:8 (5th ed. June 2018) ("[I]f a case has only one class representative and that party does not have standing, then the court lacks jurisdiction over the case and it must be dismissed.").

The rule against permitting appeals by prevailing litigants is a prudential one, but a litigant who obtains a favorable judgment must nevertheless have a personal stake to appeal. *See generally Camreta v. Greene*, 563 U.S. 692, 701-02 (2011). In an appropriate case, we may need to address whether a class member like Mr. Isaacson has standing on appeal to challenge the standing of a class representative who obtained a settlement providing economic benefits to the entire class. *Cf. King v. Cessna Aircraft Co.*, 505 F.3d 1160, 1165 (11th Cir. 2007) ("if the requirements for appellate jurisdiction are not met 'we cannot review whether a judgment is defective, not even when the asserted defect is that the district court lacked jurisdiction'") (citation omitted).